**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS STEWART, derivatively on behalf of ASP ISOTOPES INC., <br> <div align="center">Plaintiff,</div> <br> vs. <br><br> PAUL MANN, ROBERT RYAN, MICHAEL GORLEY, DUNCAN MOORE, and TODD WIDER <br> <div align="center">Defendants,</div> <br> and <br><br> ASP ISOTOPES INC., <br> <div align="center">Nominal Defendant.</div> | No.: <br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Thomas Stewart ("Plaintiff"), by his undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant ASP Isotopes, Inc. ("ASPI" or the "Company") against certain members of the Company's Board of Directors (the "Board" or the "Individual Defendants") for violations of the federal securities laws, breaches of their fiduciary duties, and other misconduct that has materially damaged the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud class action complaint filed against the Company, and certain of its current and former officers, transcripts of the Company's conference calls with financial analysts and investors, published news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that

substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    ASPI is a development-stage advanced materials company that focuses on natural isotope enrichment technologies intended for use in the medical, semiconductor, and nuclear energy industries. The Company has consistently promoted uranium enrichment—and specifically the production of high-assay low-enriched uranium ("HALEU")—as central to its business strategy and fundraising efforts. From its inception in September 2021 through the end of 2024, ASPI generated no revenue from isotope production or uranium enrichment, reported cumulative net losses exceeding $58 million, and received a going-concern warning from its independent auditor, EisnerAmper LLP. As of November 2024, ASPI had only two employees based in the United States—a Chief Financial Officer and a finance employee—while the entirety of its enrichment operations and scientific personnel were located in South Africa.

2.    The Individual Defendants breached their fiduciary duties by causing ASPI to devote the Company's limited financial resources, personnel, corporate credibility, and strategic direction to pursuing uranium enrichment using technologies that had no demonstrated capability to enrich uranium at any scale and as a federal court has now found, were "entirely theoretical." At the heart of the Company's uranium enrichment strategy was "Quantum Enrichment" ("QE"), a laser-based method that Defendant Mann later acknowledged was based on Atomic Vapor Laser Isotope Separation ("AVLIS")—a technology that governments around the world, including the United States, had abandoned after billions of dollars in failed investment because it proved to be commercially impractical.

3.      The Individual Defendants acquired the foundation for this technology through Klydon Proprietary Ltd. ("Klydon"), a South African research company whose operations had ground to a halt and whose assets were obtained through a bankruptcy-type "business rescue" process. Neither ASPI nor Klydon had ever experimented with or tested QE or any other ASPI technology on uranium—not at laboratory scale, not at pilot scale, and not at commercial scale. The Company's uranium enrichment capability existed only on paper.

4.      Despite never having tested QE on uranium, the Individual Defendants caused the Company to hire retired scientists from South Africa's defunct enrichment program, to construct facilities premised on the commercialization of a technology that had never been validated for Uranium, and to enter into a term sheet with TerraPower—a prominent nuclear innovation company backed by Bill Gates—for the construction of a HALEU production facility and a ten-year exclusive supply agreement. Each of these operational decisions committed Company resources and staked the Company's credibility on a technological capability that did not exist.

5.      Rather than investing the Company's resources in the rigorous scientific work necessary to determine whether QE could actually enrich uranium, the Individual Defendants instead directed those resources toward promoting the Company's unproven claims to investors. The Individual Defendants caused the Company to (i) pay for appearances on a paid stock promotion service, the Emerging Growth Conference, where Defendant Mann presented fabricated uranium enrichment performance metrics; and (ii) file investor presentations with the SEC, issue press releases, and arrange published interviews that represented ASPI's QE technology could enrich uranium, that the Company and Klydon had experience enriching uranium, and that ASPI's processes achieved performance metrics superior to established enrichment methods. These

representations were, as the Court later found, materially false and misleading because the Company "had never attempted to use any ASPI technology on uranium."

6.      The Individual Defendants then used these misrepresentations to raise capital. Capitalizing on the artificially inflated trading prices generated by their false claims about ASPI's technological capabilities, the Individual Defendants caused the Company to complete a public offering on November 4, 2024, selling 2,754,250 shares of common stock at $6.75 per share for approximately $18.6 million in gross proceeds—proceeds raised from investors who had been misled into believing that ASPI possessed a working uranium enrichment capability. For a company with no enrichment revenue, cumulative losses exceeding $58 million, and a going-concern warning, this $18.6 million offering was critical to the Company's survival. The Individual Defendants chose to fund the Company's operations by misleading the capital markets rather than by demonstrating that its core technology actually worked..

7.      On November 26, 2024, Fuzzy Panda Research published a detailed report (the "Panda Report") exposing the true state of ASPI's operations and technological capabilities. The Panda Report drew on interviews with former TerraPower executives, former Klydon personnel, nuclear industry leaders, and applied physicists, and revealed that ASPI had never tested its QE technology on uranium, that the Company's technology was essentially a recreation of the failed Atomic Vapor Laser Isotope Separation ("AVLIS") method that governments had abandoned after billions of dollars in failed investment—and that experts harbored serious doubts about the commercial viability of ASPI's  methods to enrich uranium. On the day the Panda Report was published, ASPI's stock price fell 26.3%, from a high of $7.94 per share to $5.85 per share.

8.      The following day, in a November 27, 2024 interview with Canaccord Genuity analyst George Gianarikas ("Gianarikas"), ASPI's Chief Executive Officer ("CEO") Paul Mann

("Mann") confirmed the core allegations of the Panda Report, admitting that the Company had never used its methods to "actually" enrich uranium. Mann further conceded that ASPI was not even close to applying its methods to uranium enrichment because it needed to "get a license" before it would be able to test its processes on uranium and acknowledged that the Company's QE technology was based on AVLIS, the very technology that experts had deemed commercially impractical. On this news, ASPI's share price fell an additional 14.2% to $5.02 per share. In total, the Company's stock price declined by approximately 34.4%, destroying hundreds of millions of dollars in market capitalization and severely damaging the Company's credibility with investors, customers, and counterparties in the nuclear energy industry.

9.      A securities class action lawsuit was subsequently filed against ASPI and Defendant Mann, captioned *Leone v. ASP Isotopes Inc., et al.*, No. 1:24-cv-09253-CM (S.D.N.Y.) (the "Securities Class Action"). On December 4, 2025, the Honorable Colleen McMahon denied in part the defendants' motion to dismiss and granted class certification. The Court found seven out of fifteen challenged statements to be actionable, held that the Amended Complaint adequately pled scienter, and found a "strong inference that Defendants acted with the required state of mind for securities fraud." The Court emphasized that under the core operations doctrine, uranium enrichment was the core of ASPI's business and central to the Company's viability, and thus it could be presumed that Defendant Mann knew that ASPI "had never conducted tests of its QE technology on uranium." Further, the Court found that the Company had motive to inflate its stock, considering its financial condition and lack of revenue, in order to profit from the public offering to the tune of $18.6 million in proceeds.

10.     In addition, on October 21, 2024, the Individual Defendants caused the Company to file a materially false and misleading proxy statement with the SEC. The 2024 Proxy Statement

falsely represented that the Board actively oversaw and monitored the Company's risk exposures and that the Company was committed to strong corporate governance practices—when in fact the Board had utterly failed to implement and maintain any effective system of internal controls, failed to oversee or monitor the material risks facing the Company, including the fundamental risk that the Company's core technology strategy was built on an entirely theoretical and potentially unworkable foundation, and failed to take action when presented with red flags regarding the Individual Defendants' misconduct.

11.    As a result of the Individual Defendants' misconduct, the Company has been exposed to significant liability in the pending Securities Class Action, including incurring costs to defend itself and Defendant Mann, has suffered severe damage to its reputation and credibility in the nuclear energy and investment communities, and has been harmed by the dissipation of corporate assets (including the $18.6 million in offering proceeds raised through fraud) devoted to a technology strategy that the Individual Defendants pursued without any reasonable basis— resources that could have been invested in the Company's legitimate isotope enrichment operations that were actually generating revenue..

12.    Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, ASPI will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because this action is brought, in part, under Sections 14(a), 20(a), and 21D of the Exchange Act, 15 U.S.C. §§ 78n(a),

78t(a), and 78u-4. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over each of the Individual Defendants because each Defendant has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to the violations complained of herein occurred in this District. In addition, the related securities fraud class action, *Leone v. ASP Isotopes Inc., et al.*, No. 1:24-cv-09253-CM, is pending in this District.

16.    In connection with the acts alleged in this Complaint, the Individual Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiff

17.    Plaintiff Thomas Stewart purchased ASPI common stock on August 14, 2024, and has held ASPI common stock continuously since that time, including at the time of the transactions complained of herein. Plaintiff was a stockholder of ASPI at the time of the wrongdoing alleged herein and has been a stockholder continuously since that time.

**B.    Defendants**

    **1.    Nominal Defendant ASP Isotopes, Inc.**

18.    ASP Isotopes, Inc. is incorporated under Delaware Law with its principal executive offices at 2200 Ross Avenue, Suite 4575E, Dallas, TX, 75201. The Company's common stock trades on the NASDAQ Exchange under the ticker symbol "ASPI".

    **2.    Individual Defendants**

19.    Defendant Mann co-founded ASPI in September 2021 and has served as CEO and Chairman of the Board since the Company's incorporation.  Mann is the Company's Executive Chairman and an ASPI director since 2021.  Since 2023, Mann has received the following compensation:

| YEAR | SALARY | BONUS | STOCK AWARDS | TOTAL |
|---|---|---|---|---|
| 2024 | $510,000 | $500,000 | $3,757,309 | $4,767,309 |
| 2023 | $480,000 | $440,000 | $1,292,657 | $2,212,657 |

20.    Defendant Robert Ryan ("Ryan") is an ASPI director since 2024 and is a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Since 2024, Ryan received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2024 | $70,000 | $304,032 | $374,032 |

21.    Defendant Michael Gorley ("Gorley") is an ASPI director since 2023 and is a member of the Nominating and Corporate Governance Committee. Since 2024, Gorley received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------|------|------|
| 2024 | $70,000 | $304,032 | $374,032 |

22.    Defendant Duncan Moore ("Moore") is an ASPI director since 2021 and is a member of the Audit Committee, the Compensation Committee (Chair), and the Nominating and Governance Committee. Since 2024, Moore received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------|------|------|
| 2024 | $70,000 | $304,032 | $374,032 |

23.    In addition to the foregoing compensation, Moore received a one-time equity award of 200,000 shares of restricted stock in connection with his appointment to a special projects committee of the Board, which vests in four equal installments every six months.

24.    Todd Wider ("Wider") is an ASPI director since 2021 and is the Chair of the Audit Committee and a member the Compensation Committee. Since 2024, Wider has received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------|------|------|
| 2024 | $70,000 | $304,032 | $374,032 |

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

25.    By reason of their positions as officers or directors of ASPI and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe to ASPI and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Inari in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of ASPI and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

26.     The Individual Defendants, because of their positions of control and authority as directors and officers of ASPI, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

27.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the NASDAQ, the Individual Defendants also owed a duty to ensure the reporting of accurate, complete, and truthful information concerning ASPI's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. To meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over ASPI's management, policies, and internal controls.

28.     At all times relevant hereto, the Individual Defendants were the agents of each other and ASPI and were always acting within the course and scope of such agency.

29.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at ASPI.

**A.     Additional Duties Under ASPI's Corporate Governance Guidelines**

30.     The Company's Corporate Governance Guidelines, adopted by the Board as of December 9, 2024, set forth the Board's own understanding of its role and obligations. Section 1 of the Corporate Governance Guidelines provides:

> The Board directs and oversees the management of the business and affairs of the Company in a manner consistent with the best interests of the Company. In addition to this oversight function, the Board serves as the ultimate decision-making body of the Company, except for those matters reserved to or shared with the Company's stockholders. The Board selects and oversees the members of the Company's senior

management, who are charged by the Board with conducting the day-to-day business of the Company.

31.    Section 5 of the Corporate Governance Guidelines further provides that "[i]n performing their duties, the primary responsibility of the directors is to exercise their business judgment in the best interests of the Company," and that:

> [E]ach director should be sufficiently familiar with the business of the Company, including its financial statements and capital structure, and the risks and competition it faces, to facilitate active and effective participation in the deliberations of the Board and of each committee on which such director serves.

32.    Section 5 also states that "[t]he Board is committed to legal and ethical conduct in fulfilling its responsibilities."

33.    Section 2(A) of the Corporate Governance Guidelines addresses director independence and provides:

> [T]he Board is also responsible for determining affirmatively, as to each independent director, that no relationships exist which, in the judgment of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. In making these determinations, the Board shall broadly consider all relevant facts and circumstances, including information provided by the directors and the Company with regard to each director's business and personal activities as they may relate to the Company and the Company's management.

## B.    Additional Duties Under The Company's Code of Business Conduct and Ethics

34.    In addition to their duties under state law and the Corporate Governance Guidelines, the Individual Defendants had specific obligations under the Company's Code of Business Conduct and Ethics (the "Code of Conduct "), adopted by the Board as of December 9, 2024. The Code "applies to every officer, director and employee" and requires:

> All of the Company's officers, directors and employees must carry out their duties in accordance with the policies set forth in this Code and with applicable laws and regulations. . . . Any violation of applicable law or any deviation from the standards

embodied in this Code will result in disciplinary action up to and including termination.

35.    Section 3 of the Code of Conduct, titled "Full, Fair, Accurate, Timely and Understandable Disclosure," provides:

> It is of paramount importance to the Company that all disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company is full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in fulfilling these responsibilities consistent with your role within the Company. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosure.

36.    Section 3 of the Code of Conduct further designates the Company's CEO and CFO as "Senior Officers" and provides:

> Senior Officers shall take all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communication made by the Company, is full, fair, accurate, timely and understandable.

> Senior Officers are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Senior Officers will take all necessary steps to ensure compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles.

37.    Section 4 of the Code of Conduct, titled "Special Ethics Obligations For Employees With Financial Reporting Responsibilities," provides:

> Each Senior Officer bears a special responsibility for promoting integrity throughout the Company. Furthermore, Senior Officers have a responsibility to foster a culture throughout the Company as a whole that ensures the fair and timely reporting of the Company's results of operation and financial condition and other financial information.

38.    Section 4 further requires that each Senior Officer will, among other things:

perform his or her duties in an honest and ethical manner; . . . take all necessary actions to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, government agencies and in other public communications; [and] comply with all applicable laws, rules and regulations of federal, state and local governments.

39.    Section 11 of the Code of Conduct, titled "Fair Dealing," provides:

You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing.

40.    Section 18 of the Code of Conduct assigns ultimate compliance accountability to the CEO, providing:

The Company's CEO shall be responsible for ensuring that this Code is established and effectively communicated to all employees, officers and directors. Although the day-to-day compliance issues will be the responsibility of the Company's managers, the CEO has ultimate accountability with respect to the overall implementation of and successful compliance with this Code.

**C.    Additional Duties Of Audit Committee Members**

41.    The Charter of the Audit Committee (the "Audit Committee Charter"), amended through December 9, 2024, imposes specific obligations on the members of the Audit Committee—Defendants Ryan, Moore, and Wider—and provides that Audit Committee members are obligated to oversee the accounting and financial reporting processes of the Company, the integrity of the financial reports and other financial information, the audits of the Company's financial statements, and the Company's compliance with legal and regulatory requirements.

42.    In particular, the Audit Committee Charter requires the Committee to, among other things:

(a) "[r]eview with management its assessment of the effectiveness and adequacy of the Company's internal control structure and procedures for financial reporting ('Internal Controls')" and "consider whether any changes to the Internal Controls are appropriate" (Section IV.B.6);

(b) "review with management its evaluation of the Company's procedures and controls designed to assure that information required to be disclosed in the Company's periodic reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC for the filing of such reports ('Disclosure Controls'), and consider whether any changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls" (Section IV.B.7);

(c) "[r]eview and discuss with management press releases regarding the Company's financial results and any other information provided to securities analysts and rating agencies" (Section IV.B.4);

(d) "[d]iscuss guidelines and policies to govern the process by which risk assessment and management is undertaken and handled" and "[d]iscuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures" (Section IV.C.7);

(e) "[r]eview with the chief executive officer and chief financial officer of the Company any report on significant deficiencies in the design or operation of the Internal Controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls" (Section IV.C.1); and

(f) "[r]eview with the Company's general counsel or outside legal counsel and report to the Board on litigation, material government investigations and compliance with applicable legal and regulatory requirements" and "oversee compliance audits or assessments, including evaluating findings and recommendations and management responses and action plans" (Section IV.C.8).

**D.    Additional Duties Of Compensation Committee Members**

43.    The Charter of the Compensation Committee (the "Compensation Committee Charter"), amended through December 9, 2024, imposes specific obligations on the members of the Compensation Committee—Defendants Moore (Chair) and Wider. The Compensation Committee Charter requires the Committee to, among other things:

Monitor and assess risks, including regulatory risks, associated with the Company's compensation arrangements and policies and consult with management regarding such risks.

Consider, on at least an annual basis, management's assessment of whether risks arising from the Company's compensation policies and practices for all employees, included non-executive officers, are reasonably likely to have a material adverse effect on the Company.

### E.    Additional Duties of Nominating And Corporate Governance Committee Members

44.    The Charter of the Nominating and Corporate Governance Committee (the "Governance Committee Charter"), amended through December 9, 2024, imposes specific obligations on the members of the Nominating and Corporate Governance Committee—Defendants Ryan (Chair), Gorley, and Moore. The Governance Committee Charter provides that the Committee's primary responsibilities include, among others, to "recommend corporate governance principles, including policies, applicable to the Company" and to "provide oversight in the evaluation of the Board and each committee." Section IV.B of the Governance Committee Charter requires the Committee to, among other things:

(a) "[d]evelop, recommend for Board approval, and review on an ongoing basis the adequacy of, the corporate governance principles applicable to the Company," including "director responsibilities, committee responsibilities, director access to management and independent advisors" and "annual performance evaluation of the Board and committees";

(b) "[r]eview and discuss with management disclosure of the Company's corporate governance practices, including information regarding the operations of the Committee and other Board committees, director independence and the director nomination process, and to recommend that this disclosure be included in the Company's proxy statement or annual report on Form 10-K, as applicable";

(c) "[i]n consultation with the Audit Committee of the Board . . . review and recommend to the Board for adoption any revisions to the Company's Code of Business Conduct and Ethics . . . and provide for prompt disclosure to the public of any change in, or waiver of the Code, and adopt procedures for monitoring and enforcing compliance with the Code"; and

(d) "[r]eview, at least annually, the Company's compliance with the corporate governance listing requirements of the Nasdaq, and report to the Board regarding the same."

45.    As CEO and Executive Chairman of the Company, Defendant Mann owed the highest duties of care and loyalty to ASPI. Mann was responsible for the day-to-day management of the Company's operations and for ensuring that the Company's public disclosures were truthful, accurate, and complete. The Company's own Code assigns Mann "ultimate accountability with respect to the overall implementation of and successful compliance with" the Code. Mann was also directly responsible, as a designated "Senior Officer," for "establishing and maintaining adequate internal control over financial reporting" and for "tak[ing] all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communication made by the Company, is full, fair, accurate, timely and understandable."

46.    The Individual Defendants breached the foregoing duties, as set forth below.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

47.    ASPI is a development-stage advanced materials company that focuses on natural isotope enrichment technologies intended for use in the medical, semiconductor, and nuclear energy industries. During the relevant period, ASPI consistently highlighted uranium enrichment—and, in particular, the production of high-assay low-enriched uranium ("HALEU")—as a central element of its business strategy and efforts to raise capital.

48.    Uranium enrichment involves separating isotopes of uranium so that the concentration of uranium-235, the fissile isotope necessary for sustaining a nuclear chain reaction, is increased relative to naturally occurring levels dominated by uranium-238. Enriched uranium is

essential for commercial nuclear reactors and other nuclear applications, making the enrichment process a critical step in transforming mined uranium into usable nuclear fuel. HALEU is uranium that has more uranium-235 in it than the fuel used in standard nuclear power plants, but still not enough uranium-235 to be considered weapons-grade. HALEU is widely viewed as a key input for certain advanced reactor designs, including small modular reactors, and its production is subject to elevated regulatory oversight, specialized handling protocols, and substantially more demanding technical and safety requirements than traditional low-enriched uranium.

49.    Historically, commercial uranium enrichment has been dominated by gas-centrifuge technology, which relies on large cascades of centrifuges operating in series to achieve the required enrichment levels. The technological sophistication, regulatory constraints, and capital intensity associated with such facilities have resulted in a highly concentrated industry consisting largely of a small number of major, often government-supported, entities that control most of the world's enriched uranium supply. These structural barriers have posed significant challenges for new entrants attempting to introduce alternative enrichment methods.

**B.    ASPI Is Formed To Pursue Non-Centrifuge Enrichment Approaches Developed By Klydon**

50.    ASPI was formed in September 2021 to pursue non-centrifuge enrichment approaches and, specifically, to acquire and commercialize the Aerodynamic Separation Process ("ASP"), an isotope separation technology developed by Klydon, a South African research-and-development company. At the time ASPI moved to acquire Klydon's assets, Klydon was in severe financial distress and its operations had largely ground to a halt. Through a South African "business rescue" process, analogous to a bankruptcy-type restructuring, ASPI obtained control of certain Klydon assets and intellectual property. A forensic accountant retained by one of Klydon's investors to examine the company beginning in September 2019 reported, after

reviewing financial records, agreements, and interviewing key personnel, that Klydon's project work had effectively stopped by that time. Over the course of 2022 and 2023, ASPI continued to consolidate control over Klydon's business interests and technology, ultimately acquiring all of Klydon's relevant assets and intellectual property.

51.    To promote its business, ASPI's external communications focused on two core technological platforms. First, ASPI promoted Klydon's ASP as an innovative isotope-separation method that could potentially be applied to uranium enrichment. Second, ASPI advanced a laser-based method it called "Quantum Enrichment" ("QE"), which it portrayed as an additional pathway for producing enriched uranium and HALEU. ASPI described QE as relying on lasers tuned to selectively photoionize specific isotopes, followed by separation using electric fields. In discussions with investors and analysts, Defendant Mann acknowledged that QE was largely based on Atomic Vapor Laser Isotope Separation ("AVLIS"), a laser-based uranium enrichment technique heavily researched by governments in prior decades but ultimately deemed commercially impractical and abandoned.

52.    ASPI's public statements repeatedly used successful enrichment of non-uranium isotopes as evidence that its technologies could also enrich uranium at commercial scale—even though the Company had never tested either technology on uranium. As alleged, notwithstanding its public promotion of ASP and QE as viable solutions for uranium enrichment and HALEU production, ASPI had not tested either technology on uranium—whether at a laboratory, pilot, or commercial scale—and lacked empirical data demonstrating that its approaches could function, scale, or compete in the uranium enrichment market.

53.    ASPI's financial disclosures further underscore its development-stage status and reliance on the successful commercialization of uranium enrichment using its methods. The

Company completed its initial public offering on November 15, 2022, selling 1.25 million shares of common stock at $4.00 per share for gross proceeds of $5 million. From inception through 2024, ASPI reported minimal revenue and substantial net losses. For 2021 through 2024, ASPI disclosed revenues of $0, $0, $433,026, and $3,944,226, respectively, against net losses of $2,607,927, $4,945,139, $16,286,234, and $35,113,240, respectively. The revenue that began to appear in 2023 did not derive from the sale of enriched isotopes or uranium enrichment services. Instead, it flowed from ASPI's majority stake in Pet Labs Pharmaceuticals Proprietary Limited ("PET Labs"), a South African radiopharmaceutical company focused on nuclear medicine, including the production of fluorinated radioisotopes and active pharmaceutical ingredients using a cyclotron in Pretoria. ASPI purchased 51% of PET Labs in October 2023 for approximately $2 million and publicly described PET Labs' operations in an accompanying press release and Form 8-K filing.

54.     In its Annual Report on Form 10-K for the year ended December 31, 2024, ASPI acknowledged that it had not generated any revenue attributable to isotope production and only limited revenue tied to PET Labs, continued to incur significant research and development and other operating expenses, and as a result, was not profitable and had recorded losses since its inception in September 2021. Its independent auditor, EisnerAmper LLP, issued a going-concern warning in connection with ASPI's Form 10-K for the year ended December 31, 2023, citing recurring operating losses and negative cash flows from operations and concluding that these conditions raised substantial doubt about ASPI's ability to continue as a going concern. ASPI disclosed that, unless and until it could generate meaningful revenue from isotope sales or nuclear medical doses, it would need to fund its operations through additional equity or debt financing or other capital-raising arrangements and that there could be no assurance such funding would be available on acceptable terms, or at all.

**C.**    **The Company And Its Officers And Directors Misrepresent ASPI's Ability To Enrich Uranium Using Its QE Method**

55.    Beginning in September 2024, the Company and its directors and officers repeatedly represented that uranium enrichment was central to the Company's success and a "core operation" for ASPI and that the Company and its predecessor, Klydon, had experience enriching uranium and had achieved results comparable to existing uranium enrichment methods.

56.    On September 26, 2024, ASPI filed with the SEC a Current Report on Form 8-K, attaching as an exhibit a presentation titled "ASP Isotopes Corporate Overview." That same day, Defendant Mann presented the slide deck at an Emerging Growth Conference call. In the presentation, ASPI prominently featured "Nuclear Energy," and the enrichment of uranium specifically, as one of three areas of focus for the Company, along with nuclear medicine and enrichment of silicon-28 for semiconductor manufacturing. The presentation highlighted projected "soaring demand for enriched uranium," stated that "uranium supply has been in a state of sustained deficit since 2018," and showed that prices for uranium enrichment had "more than doubled over the last four years."

57.    The presentation contained a slide explaining that "QE separates two isotopes by taking advantage of the slight differences in the transition energy between two isotopes. This method is described as a 'quantum mechanics' method." The slide further noted: "In principle, Quantum Enrichment can separate isotopes of most elements, achieving desired enrichment in a single step." It also stated that the QE method utilizes a laser "precisely tuned to an isotope's 'spectrum' which then allows those atoms to be 'selectively photoionized and then electrically separated based on their electric charge.'"

58.    A chart on page 28 of the presentation titled "Comparing and Contrasting Enrichment Methods," contained data allegedly comparing uranium enrichment through several

methods, including by the QE method used Quantum Leap Energy (QLE), as subsidiary of ASPI, across various performance metrics:

**Comparing and Contrasting Enrichment Methods**

| | Gaseous Diffusion | Centrifugation | Atomic Vapor laser Isotope Seperation (AVLIS) | Separation of Isotopes by Laser Excitation | Quantum Leap Energy |
|---|---|---|---|---|---|
| **Cost** | High Capital Cost | Capital 1/10 of Diffusion | Low Capital, Small Size | Low Capital, Small Size | Low Capital, Small Size |
| **Speed** | High Pressure | High Speed | U Metal 3000K | Adiabatic expansion nozzles (10-20K) | U Metal 3000K |
| **Technology Notes** | High Technology | Rotor Design & Material | Selective Photoionization | Laser Excitation Transmission by Skimmer | Enhanced Resonant Multiphoton Ionization |
| **Selectivity** | Selectivity $\alpha \geq 1.003$ | Selectivity $\alpha \geq 1.15$ | Selectivity $\alpha \geq 10\text{-}50$ | Selectivity $\alpha \geq 2\text{-}20$ | Selectivity $\alpha \geq 50$ |
| **SWU** | 2500 kWh/SWU | 50 kWh/SWU | 40 kWh/SWU | Estimate < 50 kWh/SWU | 40 kWh/SWU |
| **Stages Required** | 500 Stages to reactor grade | 50 Stages | 1-2 Stages | 1-2 Stages | Single Stage |

© ASP Isotopes Inc.                                              ASP isotopes   26

59.     The chart represents QLE's enrichment technology as a method that outperforms all the other listed methods, with a high single-pass selectivity ($\alpha \geq 50$), energy usage at around 40 kWh per SWU, and the need for only a single enrichment stage, and indicates that QLE operates on U Metal 3000K."

60.     In discussing this chart, Defendant Mann contrasted and compared different types of enrichment with "quantum leap or quantum enrichment," highlighting its superiority. He noted:

> this kind of contrasts and compares different types of enrichment and you'll see the most important line here is the selectivity line, the alpha line, and so the selectivity for centrifuge, it's about 1.15. And so that's good, and . . . when you put it into a cascade, you compound that 1.15 across the cascade, and that gives you your desired enrichment. ***But for quantum leap or quantum enrichment, selectivity is greater than 50.*** And here's an example of quantum enrichment in a real world application. This is Lithium 6 and lithium 7, so you'll see in the top chart there. That's Lithium 6 is at 7% and Lithium 7 is at 93% and after a single pass through our enrichment chamber, the Lithium 6 is now over 90%. And so that's an enrichment factor of 112. ***So when we say greater than 50, we mean substantially greater than 50.***

21

61.    These statements were made by Mann even though ASPI "had never attempted to use any ASPI technology on uranium," and thus had no uranium-specific basis for the claimed enrichment factor or energy consumption per SWU.

62.    Page 29 of the presentation highlighted that the ASPI team had "used lasers to enrich many different metals" such as, Uranium, Lithium (the only isotopes where results have been published), Zirconium, and Zinc. However, in reality, neither ASPI nor Klydon had any real-world experience enriching uranium with lasers or otherwise, as Defendant Mann later admitted. A table on the same page showed that ASPI's work on uranium-235 using both QE and ASP was in the "R&D Stage."

63.    The presentation also represented that "ASPI's advanced technologies leverage 20 years of R&D history to enrich isotopes in varying levels of atomic mass, allowing it to meet the growing demand in the Nuclear Medicine, Semiconductors, and Nuclear Energy industries."

64.    On October 17, 2024, ASPI issued a press release attached as an exhibit to a Form 8-K, announcing "the successful enrichment of Ytterbium-176 using Quantum Enrichment, a novel laser isotope enrichment technique." In the release, the Company represented that "ASPI believe its Quantum Enrichment process will be able to produce HALEU (High Assay Low Enriched Uranium) at an attractive price, allowing new nuclear energy to become available at a 'green discount' to carbon-intensive electricity production processes," even though ASPI had "never attempted to use ASPI's technology on uranium."

65.    On the morning of October 30, 2024, ASPI issued another press release, again attached to a Form 8-K, stating that ASPI "has entered into a term sheet with TerraPower, a nuclear innovation company and advanced nuclear energy developer, related to the construction of a

uranium enrichment facility capable of producing [HALEU] and the future supply of HALEU to TerraPower, as a customer" of QLE. The release added that "the parties anticipate entering into a long-term supply agreement for the HALEU expected to be produced at this facility pursuant to which the customer would purchase all the HALEU produced at the facility over a 10-year period after the expected completion of the facility," and asserted that ASPI "believes that its enrichment technologies can be deployed in a new HALEU facility for considerably lower capital costs, and in much less time, compared to the construction of an enrichment facility using a traditional centrifuge process of HALEU production."

66.     Defendant Mann was quoted as saying: "Over the last several decades, the scientists at ASP Isotopes have developed some of the world's most advanced isotope enrichment technologies. This term sheet is further validation of our belief that ASP Isotopes can offer scalable and capital efficient technology solutions to the supply challenges which exist in global isotope markets."

67.     That same day, during an Emerging Growth Conference call, Defendant Mann gave prepared remarks similar to his earlier September presentation and then took questions. When asked, "Is criticality an issue with your QE process enriching U-235?," Mann responded:

> So, criticality is the problem in any enrichment process involving U-235. You have to demonstrate to the regulators and to the people who provide your license you'll never going to be able to hit criticality. One of the advantages of our QE process is that we do it in batches, so rather than having a continuous process of hundreds of kilograms of product inside the plant at a time, you only have a small amount of product being enriched at a time. And so we believe we can demonstrate very clearly to regulators that there's no chance of hitting criticality.

**D.     The Company Sells $18.6 Million Shares At Inflated Prices**

68.     Capitalizing on the artificially inflated trading prices generated by the above misrepresentations, on October 31, 2024 ASPI filed with the SEC a preliminary prospectus supplement for an offering of its common stock. The following day, November 1, 2024, ASPI and

Canaccord Genuity LLC entered into an underwriting agreement for the sale, which was executed by Defendant Mann on ASPI's behalf. On November 4, 2024, ASPI filed the final prospectus supplement with the SEC and announced that it had completed the sale of 2,754,250 shares of common stock at a public offering price of $6.75 per share, generating approximately $18.6 million in gross proceeds.

### E. The Company Continues To Misrepresent Its Operational And Technological Abilities To Enrich Uranium

69. On November 19, 2024, POWER Magazine published an article titled "Mobility, Flexibility, Scalability: SMRs Forging Nuclear's Future," including an interview with ASPI's Vice President of Fundraising and Business Development, Viktor Petkov ("Petkov"). In response to a question regarding what "current technology" ASPI was working on "with regard to supporting the market for SMRs," Petkov stated that the Company was " focusing on producing critical nuclear fuels necessary for the operation of small modular reactors" including "HALEU (High-Assay Low-Enriched Uranium), Lithium-6 and Lithium-7, Chlorine-37, and Thorium Fluoride." When asked for a timeline for commercial operation ASPI's technology, Petkov asserted:

> Our technology is fully prepared for deployment, pending the necessary approvals to operate an isotope enrichment facility. We are targeting 2025/2026 for the production of Lithium-6 and Lithium-7. ASPI is actively engaged in discussions with multiple governments to secure authorization for the construction of a uranium enrichment plant, which will produce HALEU. Once the required permits are obtained, we anticipate that the facility could be operational within 12 to 18 months.

70. On November 22, 2024, ASPI published a revised version of the September investor presentation, which was nearly identical except for the removal of a slide titled "QE Technology: Illustrative Laser System." The November Presentation contained the same materially false and misleading statements as the September Presentation, even though ASPI "never even attempted to use ASPI's technology on uranium."

**F.      The Panda Report Exposes That ASPI Does Not Have The Operational Or Technological Capabilities To Enrich Uranium And Had Fundamental Flaws In Its Processes**

71.     On November 26, 2024, Fuzzy Panda Research published an online report exposing the true state of ASPI's operations and technological know-how, which drew on interviews with nuclear energy executives, former Klydon personnel, and an applied physicist and "revealed significant problems with ASPI's claimed uranium enrichment technology." A former TerraPower procurement executive was quoted describing the challenges ASPI faced in scaling its purported uranium enrichment efforts, including the fact that ASPI still needed to build a "manufacturing facility." The executive noted that ASPI was also missing the required processes because the Company had  "to develop the HALEU . . . the most important part." Another TerraPower former Executive described ASPI's projected timeline as "too optimistic. And not real . . . That's my view on it. . . I've worked on real projects, and I've seen how things work."

72.     The Panda Report also quoted a former Centrus C-Level executive stating, "We could have bought [ASPI] for a couple million, and we didn't think it was worth it. So, at $500 million [market cap], you're scratching your head." A former Klydon employee recounted that Klydon "had also tried and failed at selling the tech to Cameco[1]" and that Cameco's scientists were "very skeptical of the technology" and "did NOT think it would work on uranium." The Panda Report further showed that ASPI's quantum enrichment schematics "was simply a recreated illustration of AVLIS technology from a 2008 U.S. Nuclear Regulatory Commission report," and emphasized that AVLIS was a "failed enrichment method" that governments discontinued "after billions of dollars of investment failed to produce desired results."

---

[1] Cameco, a Canadian uranium giant with decades of experience and vast reserves, owns 49% of Global Laser Enrichment LLC, which is developing laser-based enrichment and has begun large-scale demonstration testing.

73.    Technical experts cited in the Report explained fundamental flaws with AVLIS-style approaches, as utilized by ASPI. Fo example, an applied physicist who recently worked at Los Alamos National Laboratory stated that "Quantum laser enrichment requires uranium in a gas form. The temperature required to make uranium a gas will damage other sensitive parts of the experiment such as . . . the parts used for separating the gaseous uranium."

74.    The Report continued: "The fundamental issue with an AVLIS-based technology is that it requires uranium metal as a feedstock, as opposed to uranium hexafluoride (UF6) which is a gas and is used as the feedstock in all other current enrichment technologies," explaining the need to "vaporize the metal at an extreme temperature of 3,400°C," the "extremely corrosive" atomic vapor that destroys "the material within the separator device," and the need to refurbish separators "every 400 hours (22 times a year), making it costly and uneconomical."

75.    The Panda Report also quoted Dr. Michael Goldsworthy, CEO of Silex Systems Limited and inventor of SILEX technology, as saying: "I can't see any different way to do AVLIS . . . AVLIS will take lots of time and money to do again . . . *I have very low hopes for ASPI*." Immediately following publication of the Panda Report, ASPI issued only a brief press release asserting that, based  on the Company and "its legal counsel's preliminary review and evaluation of the report, the Company believes the report includes speculative conjecture and claims that are inaccurate or filled with innuendo in an attempt to mislead investors" about ASPI's "technology, leadership and future growth," without identifying a single specific factual error or providing any uranium-based data in support of its prior claims.  On the day the Panda Report was published, ASPI's stock price fell 26.3% from a high of $7.94 per share to close at $5.85 per share, reflecting the market's reaction to the substantial doubt cast on ASPI's ability to construct and operate a viable uranium enrichment facility.

### G.    Defendant Mann's Response To The Panda Report Confirms That ASPI Does Not Have The Capabilities To Enrich Uranium

76.    In a November 27, 2024 interview with Canaccord Genuity analyst George Gianarikas , Defendant Mann attempted to address the Panda Report's allegations in more detail. In that interview, Gianarikas pressed Defendant Mann on, among other issues, TerraPower's reliance on ASPI's technology and whether ASPI had enriched uranium at lab scale; Defendant Mann admitted: "Yes, we don't actually know the exact number yet ***because we haven't actually enriched uranium.*** And so until we've actually tried the process out with uranium and worked out an enrichment factor . . . difficult for us to know exact numbers."

77.    Later in the same interview, Gianarikas asked whether ASPI *had seen uranium-specific lab results* in the context of ASPI's memorandum of understanding with TerraPower. At first, Defendant Mann asserted that the Company had commercial plants enriching uranium with "three commercial plants in South Africa that are enriching today." However, when pressed further, Man conceded that the Company was not currently testing its processes on enriching uranium:

> I mean, again, you know, we need to get a license before we're able to test our processes on the uranium . . . we need to get into Pelindaba and start working on uranium before we know definitively how, what the process looks like. But you know we have a very good idea. The team have done it in the day, 20-30 years ago, so they'll be able to do. But I mean again we are enriching isotopes today so people can look at [unintelligible].

78.    When asked what TerraPower could base its optimism in ASPI on, Defendant Mann answered: "I guess, we show enrichment of isotopes in all our plants and how we do it. And they have experts, they may have experts who have done it as well, maybe they were involved in the AVLIS program, maybe they've been down to visit us. So . . . based on that."

79.     When Gianarikas asked directly whether ASPI's QE process was "based on AVLIS enrichment technology," Defendant Mann acknowledged that it was based on AVLIS, and only slightly different:

> That's, a little bit, but not really. That's a bit like saying it is a car today in 2024 based on a car in 1990 . . . AVLIS we feel was a very simple, very simplistic we feel. So the spectroscopy we use is a lot more complex than what AVLIS used. We have a team of scientists who work on spectroscopy, working out what wavelengths we have to use to ionize particular isotopes. And it means we can ionize isotopes that aren't necessarily [unintelligible] ground state, which is where a problem of AVLIS was. The beam shaping has changed a lot over the last 20 years, 30 years. We have a very sophisticated group of scientists at [unintelligible] University who do our beam shaping for us. And the lasers have changed a lot as well. Back in the AVLIS day people used copper vapor lasers, whereas now you know the lasers are much more powerful, have much higher repetition rates and you know they're very different. So there's a number of differences between what AVLIS was and what we do today. They're both laser based technologies though, but they're somewhat different.

80.     When Gianarikas questioned how ASPI could have "develop[ed] on AVLIS" while South Africa's enrichment industry "remained dormant," Defendant Mann explained that ASPI had relied on legacy personnel rather than uranium work:

> You know, we've actually hired out of retirement quite a lot of the team who were involved in the enrichment back in the day. So one of our one of our main scientists, he's 73. He retired 10 years ago and we've hired him back . . . We hired a lot of those people back again. You know, and I think for a lot of them, you know, back in the 90s kind of the rug got pulled from under their feet, they suddenly stopped having to do they were doing. Their dream was to build bigger, more complex plants. And now that's what they're doing now.

81.     Gianarikas raised the broader history of failed efforts to commercialize AVLIS, noting that "people at least have tried AVLIS enrichment technology, laser based, quantum enrichment sort of enrichment technology. It hasn't worked right, it just hasn't really worked successfully," and asked why investors should believe ASPI had "figured it out." Defendant Mann replied that prior attempts were conducted "back in the 90s, early part of 2000s," in a "very

challenging" commercial environment dominated by downgraded weapons material and Russian centrifuges, and emphasized that "technology doesn't stay stationary," pointing to improved lasers and the fact that "no one's tried to improve it for the last 20 years." However, even in this answer, Mann did not identify any completed uranium experiments or uranium-specific empirical results.

82.     Gianarikas pointed out that published research had already raised "skepticism around your approach to laser enrichment," questioning whether the process "maybe gets a little too hot" and whether "using uranium metal isn't the right feedstock," and then pressed Mann on whether moving from ytterbium experiments to uranium enrichment was "too much of a leap." Defendant Mann largely sidestepped the question, again failing to point to any actual work done by ASPI on uranium enrichment:

> We're [unintelligible] process uranium at about 3000 Kelvin, that's where it vaporizes. And again we can change that temperature a little bit, change some of the attributes inside where we process it. And, you know, none of the chemicals we process are particularly friendly chemicals. Would I rather process uranium at 3000 Kelvin or UF6 gas at 70 degrees C? I'm not sure. Neither are particularly pleasant . . . we're very used to dealing with challenging chemistries. None of the chemicals we process are particularly friendly. So uranium is just one other challenging chemical. You just have the right abatement systems in place and the right safety processes in place.

83.     Gianarikas pushed Mann further on ASPI's methods, questioning whether "3000 Kelvin," the temperature the metal was heated to in ASPI's processes was "too hot" and whether "uranium metal" is "too difficult to work with as feedstock." Mann responded vaguely and again did not provide any concrete examples of uranium enrichment using the QE method:

> So is 3000 Kelvin hot? Yes, it is hot. Is it too hot? There are materials that handle 3000 Kelvin. You have to heat it up slightly differently as well. You can't use thermal heating to heat up to 3000 Kelvin [unintelligible] efficient. So there's different ways to heat it up. And then in terms of is the material challenging process? Most of the chemicals we process are challenging. It's probably, uranium is a metal, its probably less challenging than a lot of the chemicals we currently handle. So our team are very confident they can process uranium metal."

### H.    ASPI's False And Misleading Proxy Statement

84.    On October 21, 2024, the Company filed its 2024 Proxy Statement with the SEC soliciting shareholder votes to, among other things, elect Defendants Gorley and Moore to the Board and approve the Quantum Leap Energy LLC 2024 Equity Incentive Plan. The Proxy Statement was authorized by the Board and signed by Defendant Mann.

85.    The 2024 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

> Although management is responsible for the day-to-day management of the risks our company faces, our board of directors and its committees take an active role in overseeing management of our risks and have the ultimate responsibility for the oversight of risk management. The board of directors regularly reviews information regarding our operational, financial, legal, cybersecurity and strategic risks. Specifically, senior management attends quarterly meetings of the board of directors, provides presentations on operations including significant risks, and is available to address any questions or concerns raised by our board of directors.

86.    The 2024 Proxy Statement represents that the Audit Committee is engaged in vigorous oversight over risks to the Company noting that the Committee "coordinates the board of directors' oversight of our internal control over financial reporting, disclosure controls and procedures, related party transactions and code of conduct and corporate governance guidelines and management regularly reports" to the Audit Committee on "these areas."

87.    The 2024 Proxy Statement represents that the Company was committed to strong corporate governance practices:

> We are committed to maintaining strong corporate governance practices that drive effective functioning of the board of directors in its oversight role, promote the long-term interests of our stockholders and strengthen board and management accountability. Our governance practices are documented in our corporate governance guidelines, which address the role and composition of our board of directors and the functioning of the board and its committees.

88.    The foregoing statements in the 2024 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy Statement,

the Board was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2024 Proxy Statement contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices.

89.    On November 14, 2024, ASPI filed with the SEC a Current Report on Form 8-K announcing, among other things, the election of Defendants Gorley and Moore to the Board and the approval of the Quantum Leap Energy LLC 2024 Equity Incentive Plan pursuant to the solicitations in the 2024 Proxy Statement.

**I.    The Securities Class Action Is Brought Against ASPI And Defendant Mann**

90.    Following the above alleged false and misleading statements by the Company and its directors and officers, the Securities Class Action was filed against the Company, Defendant Mann, and ASPI's CFO on December 4, 2024. An amended complaint was subsequently filed against the Company and Defendant Mann on May 28, 2025, captioned *Leone v. ASP Isotopes Inc., et al.*, No. 1:24-cv-09253-CM (S.D.N.Y.) (the "Amended Complaint"). The Amended Complaint charges ASPI and Mann with violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as charges Mann with control person violations under Section 20(a) of the Exchange Act, on behalf of all purchasers of ASPI securities from September 26, 2024 through November 26, 2024, inclusive. The lawsuit alleged that the Company and

Defendant Mann made materially false and misleading statements concerning ASPI's ability to enrich uranium using proprietary technology acquired from a foreign research entity.

1.    **A Confidential Witness in the Amended Complaint Confirms That ASPI Had Never Tested Its Technological Processes On Uranium[2]**

91.    The Amended complaint contains allegations from a former Klydon and ASPI employee who worked closely with Defendant Mann.[3] CW1 explained that, as of the time she left ASPI, the Company's laser-based enrichment effort remained at the conceptual and design stage. According to CW1, "[t]hey were only planning it. They were working on the theory behind the experiments, and on the design for the test facility." CW1 stated that ASPI's Chief Technology Officer ("CTO"), Hendrik Strydom ("Strydom"), and a laboratory manager "were working alone on lasers, with some input from [Chief Scientific Advisor] Einar Ronander," in an effort CW1 understood to be led by Defendant Mann. CW1 further reported that "Einar was working on the theoretical side" and emphasized that "[i]f a project is not even, on a laboratory scale, proved, then it's a long time before it can be used in a plant."

92.    CW1 also raised serious doubts about the economic viability and maturity of ASPI's laser technology. In CW1's words, the laser technology "may not be economically feasible," and noted that there was a "lot of talk" from CTO Strydom and Einar Ronander that "it would be economical and would be better than centrifuge. ***But that has not been proven.***" CW1 further

---

[2] While Plaintiff and his undersigned attorneys have conducted their own independent investigation of the wrongdoings alleged herein, the Confidential Witness ("CW") allegations herein are based upon allegations contained in the Amended Complaint.

[3] Confidential Witness 1 ("CW1") is a former Klydon and ASPI employee with a master's degree in chemical engineering who worked directly on Klydon's experimental programs and later participated in ASPI's research efforts. CW1 served as Head of Empirical Research at Klydon beginning in July 2007 and transitioned to ASPI in connection with ASPI's acquisition of Klydon, until her termination in January 2024. In that role, CW1 worked closely with Defendant Mann and ASPI's Chief Operating Officer, Robert Ainscow, and regularly attended weekly management meetings with Mann concerning ASPI's planned molybdenum facility.

recounted that Ronander was ultimately pushed out of ASPI and that after he went on medical leave, "his office was locked, and they wouldn't give him access to any documents."

### 2.     A Motion To Dismiss The Amended Complaint Is Denied

93.     On December 4, 2025, the Honorable Colleen McMahon of the United States District Court for the Southern District of New York denied in part the defendants' motion to dismiss the Amended Complaint and granted class certification (ECF No. 57).  In the Order, the Court rejected a truth-on-market defense based on disclosures in the Company's 2023 10-K, filed on April 29, 2024 and  held that plaintiffs "plausibly allege that statements made by ASPI after the appearance of the Company's 2023 10-K superseded, contradicted, or undermined . . . earlier, cautionary disclosures." *Id* at 14. The Court also noted that "a reasonable investor would conclude that in the time between" the filing of the 2023 10-K and when the investor presentation was filed with the SEC in September 2024, "ASPI had acquired the necessary approvals and successfully conducted uranium enrichment." *Id* at 17-18.  The Court emphasized the fact that "Canaccord's financial analyst, who has twenty-four years of experience specializing in the renewable energy market, believed that ASPI had enriched uranium" which "reinforces this conclusion." *Id* at 18. Thus, the Court held that there was "more than enough at the pleading stage to render the earlier disclosures" insufficiently "intense or credible" to "counterbalance effectively" later statements by ASPI. *Id.* (internal citations omitted).

94.     The Court also held that the plaintiffs had plausible claims under Section 10(b) of the Exchange Act and Rule 10b-5(b), finding that seven out of fifteen statements were actionable. *Id.* at 19, 23.  For example, the Court held that the slide in ASPI's September 26, 2024 investor presentation comparing and contrasting enrichment methods was "materially misleading." *Id* at 35. And the Court stated that taken together, "the slide and Defendant Mann's remarks would plausibly lead a reasonable investor to believe that ASPI had operational, tested QE uranium

enrichment capabilities, when in fact it did not." The Court also emphasized that the slide noting that ASPI's team had "used lasers to enrich many different metals" was actionable because a reasonable investor could "conclude that ASPI had successfully enriched uranium since its prior SEC filing." *Id* at 37. Further, the Court stated that the September 26, 2024 presentation had mislead investors by claiming that the Company's work on uranium-235 was in the "R&D Stage" and through the statement about "ASPI's advanced technologies" which "leverage 20 years of R&D history[.]" *Id* at 38-39. The Court held that a "reasonable investor reading the slide in the context of the entire presentation – including the Lithium-6 experimental results and references to completed laser enrichment of uranium – could have understood "R&D Stage" as representing actual experimental work rather than purely theoretical efforts." *Id* at 39-40. The Court also held that the remarks by ASPI's Vice-President of Fundraising and Business Development, Petkov in the interview with POWER magazine were "materially misleading" as they misrepresented the Company's technological readiness and ability to secure regulatory approval. *Id* at 40-42.

95.    The Court further noted that Defendant Mann's statements during the October 30, 2024 Emerging Growth Conference call were "phrased in the present tense and appear to describe ASPI's current uranium enrichment operations" and therefore Mann represented to investors that "ASPI was already suing QE to enrich uranium in a matter sufficiently safe and mature to satisfy regulators, reinforcing the misimpression–created by prior statements." *Id* at 32-33. Thus, "these present-tense statements suggest that uranium enrichment was underway when it in fact had not yet begun. *Id* at 33.

96.    The Court also held that the Amended Complaint adequately pled scienter. *Id* at 42. The Court found that "ASPI's SEC filings made clear" that the Company had "no meaningful revenue, incurred massive recurring losses, and remained operational only so long as it could raise

additional capital" (*Id* at 44) and thus the Company had a motive to mislead investors. The Court also held that plaintiffs "plausibly allege that ASPI seized the opportunity to act on this motive" to drive "sharp" stock price increases and execute a "substantial equity transaction" selling more than 2.75 million shares on November 4, 2024 which raised $18.6 million. *Id* at 45. The Court noted that the "temporal proximity between the alleged misrepresentations that inflated ASPI's share price, and the multimillion-dollar stock sale by a financially distressed company, is highly probative of both motive and opportunity" and stated that at the pleading stage, the plaintiffs had "plausibly allege[d]" that the named defendants "received a concrete and personal benefit from the alleged misrepresentations." *Id* at 45, 47 (internal citations omitted).

97.     Further, the Court stated that the plaintiffs had plausibly alleged scienter by alleging "conscious recklessness on the part of Defendant Mann" through pleading Mann's acknowledgment that ASPI "hadn't actually enriched uranium" on November 27, 2024 and by the fact that Mann had "knowledge of the true state of ASPI's enrichment capabilities[.]" *Id* at 47-48. Lastly, the Court held that under the core operations doctrine, uranium enrichment was the core of ASPI's business and central to the Company's viability, and thus, it could be presumed that Mann would know that ASPI "had never conducted tests of its QE technology on uranium." *Id* at 49. Ultimately, the Court found that there was a "strong inference that Defendants acted with the required state of mind for securities fraud." *Id* at 50.

98.     The Court also found that plaintiffs had pled a plausible claim under Section 20(a) of the Exchange Act. *Id* at 52-53.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.     Plaintiff is now, and has been at all relevant times, an owner of ASPI common stock. Plaintiff was a stockholder of ASPI at the time of the wrongdoing alleged herein and has been a stockholder continuously since that time.

100.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights and has retained counsel competent and experienced in stockholder derivative litigation.

101.     Plaintiff did not make a pre-suit demand on the Board of ASPI to bring and maintain this action because such demand would have been futile and is therefore excused. At the time this Complaint was filed, the Board of ASPI consisted of five members: Defendants Mann, Ryan, Gorley, Moore, and Wider (the "Board"). For the reasons set forth below, at least three of these five directors—a majority of the Board—face a substantial likelihood of liability for the claims asserted herein and are incapable of exercising independent and disinterested business judgment in considering a demand.

### A.     Demand Is Futile As To Defendant Mann

102.     As CEO, Executive Chairman, and co-founder of ASPI, Mann was directly responsible for and personally made the materially false and misleading statements that form the basis of this action. Mann personally presented investor presentations to the public and filed them with the SEC, participated in conference calls, and authorized press releases in which he represented that ASPI's QE technology could enrich uranium and that the Company's processes achieved performance metrics superior to established enrichment methods—when in fact ASPI had never even attempted to use its technology on uranium. Mann signed the underwriting agreement for the November 2024 public offering that raised $18.6 million from investors at artificially inflated prices. Mann also authorized and signed the materially false and misleading 2024 Proxy Statement.

103.    Mann's personal exposure is substantial and confirmed by the December 4, 2025 Order of the United States District Court for the Southern District of New York in *Leone v. ASP Isotopes Inc., et al.*, No. 1:24-cv-09253-CM, denying in part the motion to dismiss the related securities class action and granting class certification. The Court held that seven out of fifteen challenged statements were actionable, adequately pled scienter, and found a "strong inference that Defendants acted with the required state of mind for securities fraud." The Court specifically found that Mann had "knowledge of the true state of ASPI's enrichment capabilities" and that, under the core operations doctrine, uranium enrichment was the core of ASPI's business and Mann would have known that ASPI "had never conducted tests of its QE technology on uranium." The Court further found that the "temporal proximity between the alleged misrepresentations that inflated ASPI's share price, and the multimillion-dollar stock sale by a financially distressed company, is highly probative of both motive and opportunity."

104.    Mann himself confirmed these allegations when, on November 27, 2024, he admitted in an interview with a Canaccord Genuity analyst that "we haven't actually enriched uranium" and that ASPI needed to "get a license before we're able to test our processes on the uranium." Mann acknowledged that ASPI's QE technology was based on AVLIS, the very technology that governments had abandoned after billions of dollars in failed investment.

105.    Defendant Mann is CEO, Executive Chairman, and Chairman of the Board of ASPI. Mann, therefore, is not independent. Indeed, ASPI's 2025 Proxy Statement, filed with the SEC on November 25, 2025, does not list Mann as an independent director.

106.    As an employee of ASPI, the Company provides Defendant Mann with his principal occupation from which he receives substantial compensation. In 2023 and 2024, Defendant Mann received total compensation packages of $2,212,657 and $4,767,309, respectively. Thus, Mann

could not consider a demand for action that might require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

107.    Mann signed the materially false and misleading 2024 Proxy Statement, which falsely represented that the Board and the Audit Committee actively oversaw the Company's risk exposures and maintained effective corporate governance practices.

108.    Mann faces a substantial likelihood of personal liability for violations of Sections 14(a), and 20(a) of the Exchange Act, and for breaches of his fiduciary duties of care and loyalty to the Company. He is an interested party in the transactions at issue and cannot impartially consider a demand.

109.    As a director of ASPI, Mann failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

110.    Mann is neither disinterested nor independent. Any demand upon Defendant Mann is futile and, thus, excused.

**B.    Demand Is Futile As To Defendant Ryan**

111.    Ryan has served as an ASPI director since 2024 and is a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Ryan was appointed to the Board less than nine months before the Company began

making the materially false and misleading statements alleged herein, at a time when the Board consisted of only five members and was dominated by Defendant Mann as the Company's co-founder, CEO, and Chairman. Ryan's appointment to the Board by Mann, and his short tenure prior to the onset of the misconduct, further undermine his ability to independently evaluate a demand.

112.    As a member of the Audit Committee, Ryan had duties regarding oversight of the risks facing the Company and ASPI's internal controls over financial reporting and disclosure practices.  However, Ryan utterly failed to  perform these essential duties. Ryan failed to ensure that the Company maintained adequate internal controls  over its operational and technological capabilities and  prevent the dissemination of materially false and misleading statements about ASPI's core operations—specifically, its purported ability to enrich uranium using its QE technology. Ryan knew or should have known that ASPI had never tested its enrichment technologies on uranium, that the Company had generated no revenue from isotope production, that ASPI's independent auditor had issued a going-concern warning, and that the Company's public representations about its technological capabilities had no empirical foundation.

113.    Ryan, as a member of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of ASPI's Code of Conduct and Corporate Governance Guidelines. Ryan utterly failed to perform these duties.

114.    Ryan authorized or approved the materially false and misleading 2024 Proxy Statement, which falsely represented that the Board and the Audit Committee actively oversaw the Company's risk exposures and maintained effective corporate governance practices.

115.    Ryan faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and for breaches of his fiduciary duties of care and loyalty. Additionally, Ryan

received total compensation of $374,032 in 2024—including $70,000 in fees and $304,032 in stock awards—a sum that is material to him and that he would not have received but for his position on the Board.

116.    As a director of ASPI, Ryan failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

117.    Ryan is neither disinterested nor independent. Any demand upon Defendant Ryan is futile and, thus, excused.

### C.    Demand Is Futile As To Defendant Gorley

118.    Gorley has served as an ASPI director since 2023 and is a member of the Nominating and Corporate Governance Committee.

119.    Gorley benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the ASPI Board through the false and misleading statements and material omissions in the 2024 Proxy Statement. As a member of the Board during the relevant period, Gorley authorized or approved the 2024 Proxy Statement, which falsely represented that the Board and the Audit Committee actively oversaw the Company's risk exposures and maintained effective corporate governance practices.

120.    Thus, Gorley faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and for breaches of his fiduciary duties of care and loyalty. Additionally,

Gorley received total compensation of $374,032 in 2024—including $70,000 in fees and $304,032 in stock awards—a sum that is material to him and that he would not have received but for his position on the Board.

121.    Gorley, as a member of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of ASPI's Code of Conduct and Corporate Governance Guidelines. Gorley utterly failed to perform these duties.

122.    As a director of ASPI, Gorley failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

123.    Gorley is neither disinterested nor independent. Any demand upon Defendant Gorley is futile and, thus, excused.

**D.    Demand Is Futile As To Defendant Moore**

124.    Moore has served as an ASPI director since 2021 and is a member of the Audit Committee, Compensation Committee (Chair), and the Nominating and Governance Committee.

125.    As a member of the Audit Committee, Moore had duties regarding oversight of the risks facing the Company and ASPI's internal controls over financial reporting and disclosure practices.  However, Moore utterly failed to  perform these essential duties. Moore failed to ensure that the Company maintained adequate internal controls  over its operational and technological capabilities and prevent the dissemination of materially false and misleading statements about

ASPI's core operations—specifically, its purported ability to enrich uranium using its QE technology. Moore knew or should have known that ASPI had never tested its enrichment technologies on uranium, that the Company had generated no revenue from isotope production, that ASPI's independent auditor had issued a going-concern warning, and that the Company's public representations about its technological capabilities had no empirical foundation.

126. Moore was also elected to the Board pursuant to the solicitations in the materially false and misleading 2024 Proxy Statement and, as a member of the Board, authorized or approved the 2024 Proxy Statement, which falsely represented that the Board and the Audit Committee actively oversaw the Company's risk exposures and maintained effective corporate governance practices.

127. Moore, as a member of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of ASPI's Code of Conduct and Corporate Governance Guidelines. Moore utterly failed to perform these duties.

128. Moore benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the ASPI Board through the false and misleading statements and material omissions in the 2024 Proxy Statement. As a member of the Board during the relevant period, Moore authorized or approved the 2024 Proxy Statement, which falsely represented that the Board actively oversaw the Company's risk management and was committed to strong corporate governance practices—when in fact the Board had failed to implement and maintain adequate internal controls and failed to oversee the material risks facing the Company, including the risk that the Company's core public representations about its uranium enrichment capabilities were without any empirical basis. Moore was required to, but failed to, ensure that the Company made truthful, accurate, and complete statements regarding its core operations.

129.    Thus, Moore faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and for breaches of his fiduciary duties of care and loyalty. Additionally, Moore received total compensation of $374,032 in 2024—including $70,000 in fees and $304,032 in stock awards—a sum that is material to him and that he would not have received but for his position on the Board. Thus, Moore is neither disinterested nor independent and cannot impartially consider a demand.

130.    Moore's independence from Mann is further undermined by their longstanding professional and educational connections. Before joining the ASPI Board, Moore served as a top-ranked pharmaceutical analyst and Managing Director at Morgan Stanley from 1991 to 2008, leading the firm's global healthcare equity research team. Mann also held positions at Morgan Stanley during his career in healthcare-focused investment roles. Both Mann and Moore are graduates of the University of Cambridge, where Mann earned an MA and an MEng in Natural Sciences and Chemical Engineering, and Moore earned a M.Phil. and Ph.D. in Biochemistry and served as a post-doctoral research fellow. These overlapping professional and educational histories establish a pre-existing network of personal and professional relationships between Mann and Moore that call into question Moore's ability to independently evaluate a demand adverse to Mann.

131.    Moore's financial dependence on his Board position is further underscored by the one-time award of 200,000 shares of restricted stock he received in connection with his appointment to a special projects committee of the Board, which vests in four equal installments every six months. Including this special award, Moore's total compensation from ASPI substantially exceeds the $374,032 reflected in his standard director fees and annual stock awards. This compensation renders Moore financially interested in maintaining his position on the Board and incapable of impartially evaluating a demand.

132.    As a director of ASPI, Moore failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

133.    Moore is neither disinterested nor independent. Any demand upon Defendant Moore is futile and, thus, excused.

**E.    Demand Is Futile As To Defendant Wider**

134.    Wider has served as an ASPI director since 2021 and is a Chair of the Audit Committee and a member of the Compensation Committee.

135.    As Chair of the Audit Committee, Wider had duties regarding oversight of the risks facing the Company and ASPI's internal controls over financial reporting and disclosure practices. However, Wider utterly failed to perform these essential duties. Wider failed to ensure that the Company maintained adequate internal controls over its operational and technological capabilities and prevent the dissemination of materially false and misleading statements about ASPI's core operations—specifically, its purported ability to enrich uranium using its QE technology. Wider knew or should have known that ASPI had never tested its enrichment technologies on uranium, that the Company had generated no revenue from isotope production, that ASPI's independent auditor had issued a going-concern warning, and that the Company's public representations about its technological capabilities had no empirical foundation.

136.    Wider authorized or approved the materially false and misleading 2024 Proxy Statement, which falsely represented that the Board and the Audit Committee actively oversaw the Company's risk exposures and maintained effective corporate governance practices.

137.    Wider's lack of independence from Mann is further demonstrated by their longstanding professional relationship. Before joining the ASPI Board at its founding, Wider served alongside Mann on the board of directors of Abeona Therapeutics Inc. (NASDAQ: ABEO), a clinical-stage biopharmaceutical company. By October 2020, following a series of board resignations, Mann and Wider were two of only four remaining directors at Abeona during a period of significant corporate upheaval, including the resignation of the CEO and a strategic alternatives review. One year later, Wider joined the ASPI Board at its founding in October 2021. This prior board service at a small company during a period of crisis established a close working relationship between Mann and Wider that predates ASPI's formation and undermines Wider's ability to independently evaluate a demand that would require him to initiate litigation against Mann.

138.    Wider's ties to Mann extend further: Wider has served on the board of directors of Varian Biopharmaceuticals, Inc., a company founded by Mann. This additional governance relationship — in which Wider serves at the pleasure of a company Mann controls — creates a direct financial and professional dependence that further precludes Wider from impartially evaluating a demand adverse to Mann's interests.

139.    Wider faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and for breaches of his fiduciary duties of care and loyalty. Additionally, Wider received total compensation of $374,032 in 2024—including $70,000 in fees and $304,032 in stock awards—a sum that is material to him and that he would not have received but for his position

on the Board. Wider is neither disinterested nor independent and cannot impartially consider a demand.

140.    As a director of ASPI, Wider failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

141.    Wider is neither disinterested nor independent. Any demand upon Defendant Wider is futile and, thus, excused.

F.    **Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused**

142.    In addition to the foregoing, the compensation received by each of the Individual Defendants is material to each of them and constitutes an additional factor rendering each of them incapable of impartially considering a demand. During 2024, Defendant Mann received total compensation of $4,767,309, and Defendants Ryan, Gorley, Moore, and Wider each received total compensation of $374,032. These sums are material to each director and create a financial interest in maintaining their Board positions that would be jeopardized by any good-faith consideration of the claims alleged herein.

143.    The Board consists of only five members, of whom Defendant Mann is the CEO, Chairman of the Board, and co-founder of the Company. The small size of the Board and Mann's dominant position as the Company's founder and chief executive create an environment in which

the remaining directors are unlikely to exercise truly independent judgment in considering a demand that would require them to initiate litigation against Mann and against themselves.

144.    ASPI is a development-stage company that has generated no revenue from its core enrichment operations, has reported cumulative net losses exceeding $58 million, and received a going-concern warning from its independent auditor. The Company has funded its operations through equity and debt financing. In this context, each director's continued compensation is particularly significant, and each director has a personal financial incentive to avoid litigation that could threaten the Company's ability to raise additional capital or their own continued service on the Board.

145.    ASPI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

146.    Publicly traded companies, such as ASPI, typically carry director & officer liability insurance from which ASPI could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover ASPI's damages.

147.    Accordingly, a majority of the Board—and indeed all five directors—face a substantial likelihood of liability for the claims asserted herein and are incapable of exercising independent and disinterested business judgment in considering a demand. Demand upon the Board is therefore excused as futile.

## VII.    CLAIMS FOR RELIEF

<u>**FIRST CLAIM**</u>
**Against The Director Defendants for**
**Violations of Section 14(a) of the Exchange Act**

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

149.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

150.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

151.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

152.    Under the direction of the Director Defendants, the 2024 Proxy Statement failed to disclose that the ASPI Board violated their fiduciary duties to ASPI and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's

core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.  Further, the 2024 Proxy Statement contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices.

153.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading and omitted material information.

154.    The false and misleading statements in, and information omitted from, the 2024 Proxy Statement were material to ASPI's stockholders in determining whether to, among other things, elect Defendants Gorley and Moore to the Board and approve the Quantum Leap Energy LLC 2024 Equity Incentive Plan.

155.    The material misstatements and omissions in the 2024 Proxy Statement damaged the Company.

156.    Plaintiff, on behalf of ASPI, seeks relief for damages inflicted upon the Company based on the misleading 2024 Proxy Statement in connection with the improper election of Defendants Gorley and Moore to the Board and the approval of the Quantum Leap Energy LLC 2024 Equity Incentive Plan.

## SECOND CLAIM
### Against The Individual Defendants for Contribution
### Under Section 21D of the Exchange Act

157.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

158.    ASPI is named as a defendant in a related securities fraud class action lawsuit captioned *Leone v. ASP Isotopes Inc., et al.*, No. 1:24-cv-09253-CM (S.D.N.Y.), that alleges and asserts claims arising under the federal securities laws. On December 4, 2025, the United States District Court for the Southern District of New York denied in part the defendants' motion to dismiss and granted class certification, confirming the Company's substantial exposure. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If ASPI is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

159.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, ASPI's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

160.    The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

161.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

162.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163.    The Individual Defendants, by virtue of their positions with ASPI and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ASPI and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause ASPI to engage in the illegal conduct and practices complained of herein. By reason of their positions as officers and directors of ASPI, the Individual Defendants were able to, and did, control the content of the Company's public filings, press releases, investor presentations, and conference call statements that contained materially false and misleading statements regarding the Company's operational and technological capabilities to enrich uranium.

164.    Plaintiff, on behalf of ASPI, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duty**

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    The Individual Defendants owed and owe fiduciary duties to ASPI.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe ASPI the highest obligation of good faith and loyalty in the administration of ASPI's affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and

principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to ASPI alleged herein.

167.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

168.    The Individual Defendants each violated their fiduciary duties to ASPI and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing ASPI's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's operational and technological capabilities to enrich uranium using its Quantum Enrichment and Aerodynamic Separation Process technologies; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

169.    The Individual Defendants further breached their fiduciary duties to ASPI by, *inter alia,* making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings, including investor presentations, press releases, conference calls, and published interviews that misrepresented ASPI's ability to enrich uranium using its methods. The Individual Defendants caused the Company to complete a public offering on November 4, 2024 at artificially inflated prices, raising approximately $18.6 million from investors who had been misled about the Company's fundamental technological capabilities, thereby exposing the Company to substantial securities fraud liability.

170.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of ASPI's affairs and in the use and preservation of ASPI's assets.

171.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ASPI has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. The Company has been exposed to substantial liability in the pending securities class action, has suffered severe reputational harm in the nuclear energy and investment communities, and has been harmed by the misallocation and dissipation of corporate resources.

172.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173.    Plaintiff, on behalf of ASPI, has no adequate remedy at law.

### FIFTH CLAIM
**Against The Individual Defendants For Aiding And Abetting Breach of Fiduciary Duty**

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

175.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

176.    In committing the wrongful acts, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

177.   Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

178.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of ASPI, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ASPI;

(c)   Declaring that the Individual Defendants violated Sections 14(a), 20(a), and 21D of the Exchange Act;

(d)   Determining and awarding to ASPI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)   Directing ASPI to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

(f)   Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g)    Awarding to the Company restitution from Defendants, and each of them;

(h)    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(i)    Granting such other and further relief as the Court deems just and proper.

## IX.    JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 2, 2026                 By:    */s/ David C. Katz*_____
                                           David C. Katz
                                         Mark D. Smilow
                                       **WEISS LAW**
                                         305 Broadway, 7th Fl.
                                         New York, NY 10007
                                         Telephone: (212) 682-3025
                                         Facsimile: (212) 682-3010
                                         Email: dkatz@weisslawllp.com
                                                    msmilow@weisslawllp.com

                                         Joshua M. Rubin
                                         Jonathan Meer
                                         4 Brighton Rd., Ste. 204
                                         Clifton, NJ 07014
                                         Email: jrubin@weisslawllp.com
                                                    jmeer@weisslawllp.com

                                         *Attorneys for Plaintiff*

## **VERIFICATION**

I, Thomas Stewart, hereby verify that I have held stock in ASP Isotopes, Inc. ("ASPI" or the "Company") since August 14, 2024. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of the Company. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Dated: 03/02/26
_____

*Thomas Stewart*
Thomas Stewart (Mar 2, 2026 12:09:50 EST)
_____
Thomas Stewart